UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
BANNUM, INC.,                           )
                                        )
                Plaintiff,              )
                                        )
        v.                              )
                                        )    Civil Action No. 03-0848 (PLF)
CITIZENS FOR A SAFE                     )
    WARD FIVE, INC., et al.,            )
                                        )
        Defendants.                     )
_____)

OPINION

        This matter came before the Court on defendants' motion to dismiss or, in the

alternative, for summary judgment and on plaintiff's motion to dismiss defendants'

counterclaim.  Upon consideration of the motions, oppositions, replies, and the entire record in

this case, the Court granted defendants' motion for summary judgment on Counts III, IV, V, VI

and VII and dismissed the remainder of the plaintiff's claims (Counts I and II) as moot by Order

of March 31, 2005.  The Court also granted plaintiff's motion to dismiss defendants'

counterclaims.  This Opinion explains the reasoning of the Court's earlier Order.

I.  BACKGROUND

        Plaintiff Bannum Incorporated is a Kentucky corporation in the business of

operating Community Corrections Centers ("CCCs") around the United States.  See First

Amended Complaint ("Compl.") ¶ 8.  Bannum bids for contracts to operate CCCs with the

United States Bureau of Prisons ("BOP") on a competitive basis and operates 17 CCC facilities

nationwide.  See Compl. ¶¶ 8-10.  At issue in this case is a CCC Bannum proposed to construct and operate in Ward 5 in Northeast Washington, D.C.

Defendants are Citizens for a Safe Ward Five ("Ward Five"), Darryle A. Carter, Advisory Neighborhood Commission 5B ("ANC5B"), and Regina James.  Ward Five is a corporation organized under the laws of the District of Columbia that opposes the location of Bannum's CCC in Ward 5.  See Compl. at 3.  Darryle Carter is a community activist and a resident of Ward 5.  See  id.  ANC5B is an advisory neighborhood commission that also opposes the location of a Bannum's CCC in Ward 5.  See id.[1]  Regina James is an ANC5B commissioner. See id.

In March and April 2000, plaintiff received two Requests for Proposals ("RFPs") from the BOP for Bannum to provide CCC services in Washington, D.C.  The BOP requested that Bannum submit a bid proposal containing, among other things, a description of a suitable facility that would meet all zoning requirements, as well as documentation of local zoning officials' concurrence with the proposed CCC.  See Compl. ¶¶ 9-10; see also Ex. 5 to Defendants' Memorandum of Points and Authorities in Support of its Motion to Dismiss and/or in the Alternative for Summary Judgment ("Def. Mot. Dism.").  Bannum located an acceptable property in Ward 5, a warehouse located at 2210 Adams Place, N.E., in the District of Columbia. The warehouse is located in a district zoned for commercial light manufacturing (zoning designation C-M-2).  See Def. Mot. Dism. at 1.

---

[1]     Advisory Neighborhood Commissions are units of the District of Columbia government designed to insure the input of District residents on issues that directly affect them. ANCs are effectively advisory boards made up of residents of the neighborhoods they represent. ANC5B is one of the three ANCs representing Ward 5.

In furtherance of its bid proposal, Bannum negotiated a lease for the proposed CCC site and began contacting District of Columbia government officials and community leaders in an attempt to secure zoning approval.  See Compl. ¶¶ 11-12.  In December 2000, Bannum, through counsel, wrote a letter to then Zoning Administrator Michael Johnson stating its position that Bannum could operate the CCC as a "matter of right" in the C-M-2 zone.  See Letter from Carolyn Brown to Michael Johnson (Dec. 11, 2000) ("Johnson Concurrence"), Ex. 7 to Def. Mot. Dism.

Bannum categorized the proposed CCC as a "[t]emporary detention or correctional institution on leased property," which under District of Columbia Municipal Regulations could operate as of right in a district zoned C-M "for a period not to exceed three (3) years."  See D.C. MUN. REG. tit 11 § 801.7(k).  By contrast, "halfway houses," or "community-based residential facilities" ("CBRFs"), have no right to operate in a C-M district without approval of the Board of Zoning Adjustment ("BZA").  See D.C. MUN. REG. tit 11 § 801.2; D.C. MUN. REG. tit 11 § 199.1 (defining CBRFs to include halfway houses).[2]  Plaintiff stated in its letter (and has maintained since) that the proposed CCC at Adams Place would be a temporary correctional institution rather than a CBRF and therefore could operate in Ward 5 as a matter of right, so the project could proceed without BZA approval.  See Johnson Concurrence.

Mr. Johnson concurred in writing with Bannum's assertions about the zoning classification of the proposed facility.  See Johnson Concurrence.  In November 2001, Bannum contacted then Acting Zoning Administrator Olutoye Bello and also received his concurrence.

---

[2]     The BZA is a five-member quasi-judicial body that hears and decides cases involving zoning variances, special exceptions, and appeals of administrative decisions.  See District of Columbia Office of Zoning Web Site, http://dcoz.dc.gov/faqs/faq.asp.

See Letter from Carolyn Brown to Olutoye Bello (Nov. 26, 2001), Ex. 8 to Def. Mot. Dism.  In

its letters, Bannum referred to the proposed facility as a "residential Community Corrections

Center."  In addition to contacting community leaders and zoning officials, Bannum also paid for

two round trip air-fares to Orlando, Florida for two officials of ANC5B, Rhonda Chappelle and

James Bowser, in June 2002.  See Black v. District of Columbia, Civil No. 03-1639, Transcript

(D.C. Super. April 4, 2003), Ex. 11 to Def. Mot. Dism.  The ostensible purpose of the trip was to

allow Chappelle and Bowser to inspect Bannum's CCC operations in Florida.

Bannum was the only bidder on the project that complied with the conditions of

the RFPs, and on November 16, 2001 the BOP awarded Bannum a contract for the proposed

CCC.  See Compl. ¶¶ 13-14.  In October 2002, Bannum applied to the District of Columbia

Department of Consumer and Regulatory Affairs ("DCRA") for a permit for the construction of

a 150-bed CCC.[3]  The permit was granted on December 12, 2002.

In January 2003, defendants Darryle Carter and Ward Five began to notify the

community of Bannum's proposal to operate a CCC in Ward 5.  See Def. Mot. Dism. at 4.  Ward

Five released a flyer advertising a community meeting to discuss the proposed CCC, stating that

Bannum planned to bring "criminals including sex offenders, arsonists and child molesters into

our community."  See Ex. 13. to Def. Mot. Dism.  On February 8, 2003, Ward Five released

another flyer stating that Bannum had attempted to "buy local official's [sic] votes by taking

them to Orlando, Florida" and that Bannum had used "intentional deception" to gain zoning

approval.  Compl. ¶ 15.  Residents of Ward 5 began to express concern over the close proximity

---

[3]        The DCRA manages permit processing, building inspection, and zoning programs
in the District of Columbia.  Any new construction project requires a permit from the DCRA's
Building and Land Regulation Administration.

of the CCC to an elementary school, the prospect of felons coming into their community, and the possible impact on property values.  See Def. Mot. Dism. at 4.  Some residents also believed that Bannum improperly had circumvented zoning laws by obtaining a permit for the CCC without seeking BZA approval.  See Ex. 13 to Def. Mot. Dism.

In their public campaign to stop the Bannum project, defendants claimed that plaintiff had sought to circumvent the legal requirement of BZA approval by improperly characterizing its project as a "temporary detention or correctional institution."  Defendants claimed that the CCC was actually a halfway house properly categorized as a CBRF and therefore subject to BZA review. See Def. Mot. Dism. at 2, 6.

On January 13, 2003, Ward 5 Councilmember Vincent Orange wrote to DCRA director David Clarke, protesting the DCRA's issuance of a building permit to Bannum on the ground that the 5-year term of the BOP contract exceeded the 3-year period in which Bannum could operate its CCC as a matter of right, even assuming that BZA approval was not required for the project.  See Letter from Vincent Orange to David Clarke (Jan. 13, 2003), Ex. 14 to Def. Mot. Dism.  While maintaining that Bannum's operation of the CCC in Ward 5 was consistent with zoning regulations, Clarke agreed to modify Bannum's certificate of occupancy so that it would expire in three years.  See Letter from David Clarke to Vincent Orange (Jan. 31, 2003), Ex. 16 to Def. Mot. Dism.  The DCRA issued a revised building permit on January 17, 2003, indicating that the use of the facility was limited to three years.  See Appeal No. 16998 of Advisory Neighborhood Commission 5B, Order (D.C. Bd. Zoning Adjustment Sept. 9, 2003) ("BZA Decision") at 6, Suppl. Ex. 27 to Defs. Mot. Dism.

On January 24, 2003, ANC5B appealed to the BZA the DCRA's issuance of a permit to Bannum.  See Memorandum from Regina James to BZA, Ex. 15 to Defs. Mot. Dism.

Regina James, Darryle Carter and other residents of Ward 5 then filed suit in the Superior Court of the District of Columbia, seeking an injunction to prevent the DCRA from issuing a final occupancy permit to Bannum and to stop Bannum from operating the facility. See id.

On April 8, 2003, Superior Court Judge Neal Kravitz denied defendants' request for injunctive and declaratory relief.  See Black v. District of Columbia, Civil No. 03-1639, Order Denying Plaintiffs' Motion for Preliminary Injunction Pendente Lite (D.C. Super. April 8, 2003).  Judge Kravitz was not persuaded that defendants would be irreparably harmed and noted that "it remains unclear whether the Bannum facility is properly viewed under the District's zoning law as a 'community based residential facility' or as a 'temporary detention or correctional institution.'"  See id. at 4.  He stated, however, that in the absence of a BZA determination on the issue, plaintiffs could not demonstrate success on the merits of their claims. See id. at 4-5.

On the day of the Superior Court's ruling, Bannum filed its complaint in this Court, asserting claims of libel, tortious interference with contracts and business relations, and abuse of process and seeking declaratory, injunctive and compensatory relief.  On April 17, 2003, plaintiff filed a motion for a temporary restraining order and preliminary injunction to prevent defendants' further "interference with plaintiff's business relationship," and to prevent them from publicly appealing to the BZA.  On April 22, 2003, the Court denied plaintiff's motion.  See Order (Apr. 22, 2003)

On September 9, 2003, the BZA reversed the DCRA's decision to issue a permit to Bannum on the ground that the DCRA improperly had concluded that the proposed facility could operate as of right in a C-M district.  See BZA Decision at 16.  The BZA found that the

proposed CCC was neither a CBRF (as defendants contended), because of the number of

residents of the facility, nor a "temporary detention or correctional institution" under D.C. MUN.

REG. tit 11 § 801.7(k) (as plaintiff argued), because the facility was intended to be permanent

rather than temporary.  See BZA Decision at 13-16.  According to the BZA, a facility like the

proposed CCC was clearly outside the legislative intent of Section 801.7(k), which was adopted

in 1971 specifically to relieve a "short term crisis" of prison overcrowding.  See id. at 14-15.

        The District of Columbia Office of Campaign Finance subsequently found

ANC5B commissioners Chappelle and Bowser to have violated the District of Columbia

Campaign Finance Reform and Conflict Act of 1974, D.C. CODE ANN. § 1-1106.01 (c), by

failing to disclose their receipt of round trip air-fares to Orlando from Bannum.  See In Re:

Rhonda Chappelle, Docket No. 03-01 (D.C. Office of Campaign Fin. Nov. 5, 2003); In Re:

Joseph Bowser, BOEE No. 04-002(a) (D.C. Bd. of Elections & Ethics July 15, 2004).  Bannum

also was found to have violated the Act, and was fined $4000.  See In Re: Bannum, Inc., BOEE

No. 04-002(b) (D.C. Bd. of Elections & Ethics July 15, 2004).

        Plaintiff's complaint in this Court asserts seven claims for declaratory and

injunctive relief as well as for damages.  Count I requests a declaration that Bannum properly

gained zoning approval for the proposed CCC and did not "ILLEGALLY usurp local zoning

laws," as alleged in defendants' flyers.  See Compl. ¶¶ 23-26.  Count II requests that the Court

permanently enjoin defendants from further abuse of process, defamation and tortious

interference with contract and with plaintiff's business relationship with BOP.  See id. ¶¶ 27-29.

Counts III and IV assert claims of libel and libel per se based on defendants' public relations

campaign against zoning approval of the CCC and on defendants' accusations that plaintiff had

engaged in criminal activity.  See id. ¶¶ 30-35.  Counts V and VI assert tortious interference with

7

plaintiff's contract and ongoing relationship with BOP.  See id. ¶¶ 36-43.  Count VII raises a

claim for abuse of process based on defendants' complaint in the Superior Court as well as their

appeal of Bannum's zoning approval to the BZA.  See id. ¶¶ 44-48.

Defendants filed a counterclaim for abuse of process based on the current

litigation, which defendants allege is frivolous and unfounded.  See Amended Answer to

Complaint and Counterclaim ("Ans. and Counter Cl.") at 5.[4]  Defendants pray for compensatory

and punitive damages as well as attorney's fees.  Id. at 6.

Defendants filed a motion to dismiss or, in the alternative, for summary judgment

on plaintiff's complaint, and plaintiff moved to dismiss defendants' counterclaim.  For the

reasons here stated, the Court granted defendants' motion for summary judgment and also

granted plaintiff's motion to dismiss the counterclaim.

## II.  DISCUSSION

On a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the

Federal Rules of Civil Procedure, the Court must assume the truth of the facts alleged in the

complaint and may grant the motion only if it appears beyond doubt that the plaintiff will be

unable to prove any set of facts that would justify relief.  Summit Health, Ltd. v. Pinhas, 500

U.S. 322, 325 (1991); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Browning v. Clinton, 292

F.3d 235, 242 (D.C. Cir. 2002); Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).

The complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff the

benefit of all inferences that can be derived from the facts alleged.  Kowal v. MCI

Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); accord Andrx Pharmaceuticals v.

---

[4]        Defendants ANCB5, Regina James, and Ward Five each filed a separate answer,
but their filings all assert the identical counterclaim for abuse of process.

Biovail Corp. Int'l, 256 F.3d 799, 805 (D.C. Cir. 2001).  Nonetheless, the Court need not accept

plaintiff's factual inferences if they are not supported by facts alleged in the complaint, nor must

the Court accept plaintiff's legal conclusions.  See National Treasury Employees Union v.

United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996);  Kowal v. MCI Communication Corp., 16

F.3d at 1276.  When considering a motion to dismiss under Rule 12(b)(6), the Court generally

may not look outside the facts contained within the four corners of the complaint, see Gordon v.

National Youth Work Alliance, 675 F.2d 356, 361 (D.C. Cir. 1982), unless it treats the motion to

dismiss as a motion for summary judgment.  See FED. R. CIV. P. 12(b); Currier v. Postmaster

Gen., 304 F.3d 87, 88 (D.C. Cir. 2002); 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL

PRACTICE ¶ 12.34(2) (2002 ed.).

        Summary judgment shall be granted if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits or declarations, if any,

demonstrate that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Material facts are those that

"might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  Disputes over facts that may affect the outcome of the case preclude

summary judgment.  See id.  On a motion for summary judgment, "the evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Washington Post Co. v. United States

Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).  The non-moving

party's opposition must consist of more than mere unsupported allegations or denials and must

be supported by affidavits or other competent evidence setting forth specific facts showing that

there is a genuine issue for trial.  FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317,

324 (1986).  The non-moving party is "required to provide evidence that would permit a

reasonable jury to find" in its favor.  <u>Laningham v. United States Navy</u>, 813 F.2d 1236, 1242

(D.C. Cir. 1987).

### A. Libel Claims (Counts III & IV)

Plaintiff claims that defendants' February 28, 2003 press release constitutes libel

*per se* in that it falsely accuses plaintiff of criminal activity in its attempts to obtain zoning

approval for the CCC project.  <u>See</u> Compl. ¶ 31.  Plaintiff alleges that defendants made these

false statements in an attempt "to injure plaintiff's trade, profession, and community standing."

Compl. ¶¶ 32, 35.

To prevail on a claim of libel in the District of Columbia, a plaintiff must show:

(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that

the defendant published the statement without privilege to a third party; (3) that the defendant's

fault in publishing the statement amounted to at least negligence; and (4) either that the

statement was actionable as a matter of law irrespective of special harm or that its publication

caused the plaintiff special harm.  <u>See</u> <u>Klayman v. Segal</u>, 783 A.2d 607, 613 (D.C. 2001).  A

plaintiff must prove the defamatory nature of a libelous publication, unless the publication

constitutes libel *per se*.  <u>See</u> <u>Wiggins v. Philip Morris, Inc.</u>, 853 F. Supp. 458, 465 (D.D.C. 1994)

(citing <u>Weaver v. Grafio</u>, 595 A.2d 983, 988 (D.C. 1991)).  Libel *per se* requires the actual

imputation of a criminal offense.  <u>See</u> <u>Raboya v. Shrybman & Assocs.</u>, 777 F. Supp. 58, 60

(D.D.C. 1991) (citing <u>Smith v. District of Columbia</u>, 399 A.2d 213 (D.C. 1999)).

The Supreme Court has held, however, that the First Amendment shields a

defendant from liability for defamation claims (including libel) unless the plaintiff can show by

clear and convincing evidence that the defendant has published a defamatory falsehood with "actual malice." See New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 285-86 (1964); see also Masson v. New Yorker Magazine, 501 U.S. 496, 510-11 (1991). "Actual malice" constitutes knowledge that the published statement was false or reckless disregard for its veracity. See New York Times Co. v. Sullivan, 376 U.S. at 280. Defendants are, however, only entitled to First Amendment protection when the object of the defamatory statement is a public official or a public figure. Public figures include individuals who "voluntarily or involuntarily have become involved in an issue of general or public interest." Lohrenz v. Donnelly, 223 F. Supp.2d 25, 41 (D.D.C. 2002), aff'd 350 F.3d 1272 (D.C. Cir. 2003) (citing Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)); see also Rosenbloom v. Metromedia Inc., 403 U.S. 29, 43 (1971) ("If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not voluntarily choose to become involved."). Whether a private individual has become a public figure for purposes of the New York Times standard depends on the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." See Gertz v. Robert Welch, Inc, 418 U.S. at 352.

Defendants argue that plaintiff is a public figure because it has thrust itself into the "vortex" of a public controversy. See Def. Mot. Dism. at 17. As such, defendants should be afforded the benefit of the New York Times standard. Defendants further contend that plaintiff's libel claims cannot survive summary judgment due to plaintiff's inability to present clear and convincing evidence that defendants acted with actual malice. See Def. Mot. Dism. at 17. Plaintiff does not address specifically defendants' argument that plaintiff is a public figure, but instead argues that defendants are not members of the media and therefore should not be

afforded the benefit of the <u>New York Times</u> standard.  <u>See</u> Pl. Res. at 19-20. Consequently,

plaintiff argues, it does not have to prove actual malice to prevail on its libel claims.  <u>See</u> <u>id</u>.

       The D.C. Circuit has formulated a three-pronged test to determine whether a

plaintiff has become a public figure.  <u>See</u> <u>Lohrenz v. Donnelly</u>, 350 F.3d at 1279 (citing

<u>Waldbaum v. Fairchild Pubs., Inc.</u>, 627 F.2d 1287, 1296 (D.C. Cir. 1980)).  First, the court must

isolate the public controversy and determine whether it is a real dispute, the "outcome of which

affects the general public or some segment of it in an appreciable way."  <u>Waldbaum v. Fairchild</u>

<u>Pubs., Inc.</u>, 627 F.2d at 1296.  Second, the court must determine whether the plaintiff is involved

in the dispute in a substantial and non-trivial way.  <u>See</u> <u>id</u>. at 1297.  Finally, the alleged

defamation must be germane to the plaintiff's participation in the controversy.  <u>See</u> <u>id</u>. at 1298.

       In the present case, the controversy clearly affects a segment of the public, the

residents of Ward 5, in an appreciable  way.  In seeking to locate a CCC in Ward 5, plaintiff

opened itself to the criticism of local residents concerned about the effects a CCC located in

close proximity to their homes would have on property values, quality of life and public safety.

<u>See</u> Ex. 13 to Def. Mot. Dism.  Bannum itself acknowledged the impact a CCC could have on

the public, holding a series of public meetings on the project in April 2002.  The matter was

enough of a public concern that residents organized and incorporated Ward Five in order to

oppose Bannum's proposal.  Residents also were sufficiently concerned to push Ward 5

Councilmember Vincent Orange to protest the DCRA's issuance of a building permit.

Moreover, in its September 2003 decision reversing the DCRA's determination, the BZA

acknowledged that residents of Ward 5, represented by ANC5B, were affected by the location of

a CCC in their community.  Clearly, Bannum is voluntarily involved in a controversy that has an

impact upon an appreciable segment of the public.

Bannum also is clearly at the center of this public controversy, into which it has injected itself by contacting public officials, meeting with various community organizations, holding public meetings, and advertising in *The Washington Post*.  See Compl. ¶ 12.  The very nature of Bannum's business relations with the BOP, a federal agency, invites the type of public discourse and scrutiny that the Supreme Court sought to protect by creating a heightened standard for defamation claims brought by public figures.  See New York Times Co. v. Sullivan, 376 U.S. at 270 ("Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.").

Finally, the alleged defamation was germane to the controversy and to plaintiff's participation in it.  Defendants' statements concerned*, inter alia*, the circumvention of zoning laws and the introduction of convicted felons into the community, both of which are the source of the controversy and germane to the plaintiff's involvement.  Bannum therefore meets all the Waldbaum criteria as a "public figure," and defendants must be afforded the protection of the New York Times standard.

The Court concludes that Bannum is a public figure, that the New York Times standard therefore applies in the present case, and that proof of actual malice therefore is required.  Because plaintiff has not introduced evidence sufficient to demonstrate actual malice, plaintiff's libel claims do not survive summary judgment.  In its complaint, plaintiff avers that defendants falsely accused Bannum of circumventing zoning laws, illegally influencing public officials and falsely alleging that Bannum would introduce "sex offenders, arsonists, and child molester [sic]" into Ward 5.  Compl. ¶¶ 15-19.  Plaintiff has not alleged, however, that those statements were made with knowledge of or reckless disregard for their falsity, nor has it offered

any evidence from which a reasonable jury could conclude that defendants acted with actual malice.

The available evidence suggests, if anything, that defendants' statements may not have been false at all.  For example, the BZA determined that the DCRA had erroneously awarded Bannum a permit to operate a CCC, lending credence to defendants' accusation that Bannum had circumvented local zoning laws.  See BZA Decision at 16.  The District of Columbia Board of Elections and Ethics found both Rhonda Chappelle and Bannum to have violated District of Columbia ethics laws in failing to disclose Chappelle's receipt of a round trip airfare to Orlando from Bannum, suggesting that defendants' accusations of Bannum's attempts to influence public officials illegally also may have had merit.

Plaintiff also cannot show that defendants' statements concerning the introduction of arsonists and child molesters into the community were made with knowledge of their falsity or reckless disregard for their veracity.  When defendants  published their flyers, they could not have known the identity of the future residents of the proposed CCC.  It was not out of the realm of possibility, however, that Bannum's CCC could have housed felons convicted of violent crimes – plaintiff is, after all, in the business of reintroducing convicted felons back into the community.[5]

---

[5]     The Court is not persuaded by plaintiff's argument that the New York Times standard should apply only to media defendants.  Although the Supreme Court noted a distinction between media and non-media defendants in Gertz v. Robert Welch, Inc., 418 U.S. at 341, 345, this distinction does not determine what speech should be afforded protection.  Indeed, a majority of justices of the Supreme Court abandoned the media/non-media distinction in Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749 (1985), instead adopting a "public concern" standard to determine when parties should be afforded First Amendment protection.  The Court stated that it had "long recognized that not all speech is of equal First Amendment importance," but that speech on "matters of public concern" is "at the heart of the First Amendment's protection." Dun & Bradstreet v. Greenmoss Builders, 472 U.S. at 758-59, 781-84 (Brennan, J., with whom Marshall, Blackmun and Stevens, J.J., joined, dissenting).  The District of Columbia

14

Because plaintiff has failed to offer evidence that would allow a jury to find clearly and convincingly that defendants' accusations were false and that defendants published those false accusations knowingly or with reckless disregard for their veracity, plaintiff's libel claims cannot survive summary judgment.[6]

## B. Tortious Interference with Contract (Count V)

"Tortious interference with contractual relations arises when a defendant interferes with a contract between the plaintiff and some third party." Weaver v. Gross, 605 F. Supp. 210, 216 (D.D.C. 1985) (citing Donohoe v. Watt, 546 F. Supp. 753, 757 (D.D.C. 1982), aff'd 713 F.2d 864 (D.C. Cir. 1983)).  In order to prevail on a claim of tortious interference under District of Columbia law, a plaintiff must show that: (1) a legal contract existed; (2) the defendant had knowledge of the contract; (3) the defendant intentionally procured the contract's breach; and (4) damages resulted from the defendant's actions.  See Cooke v. Griffiths-Garcia Corp., 612 A.2d 1251, 1256 (D.C. 1992); see also Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc., 565 A.2d 285, 289-90 (D.C. 1989).  To prevail on its claim for tortious

---

Court of Appeals also has noted the Supreme Court's rejection of the media/non-media defendant distinction for purposes of applying the New York Times standard.  See Moss v. Stockard, 580 A.2d 1011, 1022-23 (D.C. 1990).

This Court concludes that the media/non-media distinction is irrelevant to the present case and adopts the "public concern" standard articulated in Dun & Bradstreet.  As the Court already has determined, the construction of a CCC in Ward 5 clearly affected a discernable segment of the public and therefore was a matter of public concern that invited public debate.

[6]     Defendants raise three additional defenses to plaintiff's libel claims: (1) plaintiff has failed to allege that defendants made any false statements; (2) defendants' accusations are true; and (3) even if plaintiff is not a public figure, defendants are entitled to a qualified privilege for their statements.  See Def. Mot. Dism. at 17-20.  Because it holds the defendants are entitled to the protection of the New York Times standard, and because plaintiff has not alleged actual malice, the Court need not consider these arguments.

interference, therefore, plaintiff must show that defendants' interference resulted in some breach of the alleged contract. See Curaflex Health Servs. v. Bruni, 899 F. Supp. 689, 694 (D.D.C 1995) (citing Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc., 565 A.2d at 289); Cooke v. Griffiths-Garcia Corp., 612 A.2d at 1256.[7]

Plaintiff alleges that by publishing false statements and actively trying to revoke Bannum's zoning approval, defendants have interfered intentionally with plaintiff's contract with the BOP. See Compl. ¶¶ 41-43. Plaintiff has not, however, proffered evidence to prove that the contract has been breached. Therefore, plaintiff cannot prevail on its claim for tortious interference and defendants are entitled to summary judgment on Count V.

Even if plaintiff had alleged a breach of its BOP contract, its tortious interference claims still would fail. Once a plaintiff has made a *prima facie* case for tortious interference with a contract, the burden shifts to the defendant to prove that its conduct was not "improper." Curaflex Health Servs. v. Bruni, 899 F. Supp. at 695 (citing Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc., 565 A.2d at 290 and RESTATEMENT (SECOND) OF TORTS §§ 766-67). To avoid liability, the alleged tortfeasor may show that his or her conduct was legally justified. See Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc., 565 A.2d at 290. In considering whether an alleged tortfeasor's actions were legally justified in this

---

[7]        There is an apparent conflict between District of Columbia courts and federal courts in applying D.C. law concerning whether a claim for tortious interference with contractual relations requires the interference to have resulted in a breach of the contract. See Ulico Cas. Co. v. Prof'l Indem. Agency, Inc., 1999 U.S. DIST. LEXIS 8591, *8-*9 (D.D.C. 1999) (noting conflict); compare Cooke v. Griffiths-Garcia Corp., 612 A.2d at 1256, with Equity Group Ltd. v. Painwebber, Inc., 839 F. Supp. 930, 934 (D.D.C. 1993). District of Columbia courts' decisions control in this instance, however, and so plaintiff must plead an actual breach of the contract. See Erie R.R. v. Tompkins, 304 U.S. 64, 82 (1938); see also Keefe Co. v. Americable Int'l, 219 F.3d 669, 670 (D.C. Cir. 2000) (District of Columbia treated as a state for purposes of Erie doctrine).

context, courts in the District of Columbia look to the factors set forth in the Restatement

(Second) of Torts: (a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the

interests with which the defendant's conduct interferes; (d) the interests sought to be advanced

by the defendant; (e) the social interests in protecting the defendant's freedom of action and the

contractual interests of affected parties; (f) the proximity of the defendant's conduct to the

interference; and (g) the relations between the parties.  See id. (citing RESTATEMENT (SECOND)

OF TORTS §§ 766-67).

   Plaintiff accuses defendants of tortiously interfering with plaintiff's BOP contract

by filing a frivolous BZA appeal and a frivolous action in the Superior Court and by making

false and defamatory statements.  See Compl. ¶¶ 38-43.  Plaintiff maintains that defendants'

actions were motivated by the improper goal of interfering with plaintiff's contract with the BOP

so that a Bannum competitor could be awarded the contract to build a CCC in Ward 5.  See

Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Amended Complaint or in the

Alternative for Summary Judgment ("Pls. Opp.") at 12.  Defendants argue that their actions were

legally justified, as evidenced by BZA's finding that Bannum could not operate the proposed

CCC in Ward 5 as a matter of right.

   Consideration of the Restatement factors shows defendants' actions to have been

legally justified.  Defendants' arguments in favor of their motion for a preliminary injunction

and their appeal of Bannum's zoning approval were not without legal merit, as evidenced by

their successful appeal to the BZA.  Bannum's interest in maintaining a contract with the BOP

did not outweigh defendants' right to have their grievances heard by the D.C. Superior Court or

the BZA.  Indeed, the goal sought to be advanced by the defendants – requiring Bannum to seek

zoning approval in compliance with local law – far outweighs Bannum's business interests.  The

public clearly has a significant interest in allowing individuals affected by controversial zoning matters to have their voices heard.

  Viewing the evidence in the light most favorable to plaintiff, Bannum cannot prevail on its claim for tortious interference with contract because it has alleged no actual breach of its contract with the BOP and because no reasonable jury could conclude that defendants' actions in seeking redress in Superior Court and before the BZA were not legally justified. Accordingly, defendants are entitled to judgment as a matter of law on Count V of plaintiff's complaint.[8]

### C. Tortious Interference with Prospective Economic Advantage (Count VI)

  To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must show: (1) the existence of an established business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferor, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.  See Bennett Enters. v. Domino's Pizza, 45 F.3d 493, 499 (D.C. Cir. 1995) (citing Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 422-23 (D.D.C. 1988) and Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan, 374 A.2d 284 (D.C.

---

[8] The Court also notes that although plaintiff accuses all defendants of improperly trying to shut Bannum down, it has introduced evidence of improper motive only as to defendant and ANC5B Commissioner Regina James (and perhaps by extension to ANC5B).  Bannum submits a letter from Commissioner James to Charles B. Reynolds allegedly demonstrating defendants' real motive to "force Bannum out of town," supposedly to allow one of Bannum's competitors to assume the BOP contract.  See Pls. Opp. at 16; Letter from Regina M. James to Charles M. Reynolds, Jr. (Jan. 25, 2001) ("James Letter"), Ex. C to Compl.  The letter states nothing more sinister than that "I support you and your associates bid on the RFP [for a CCC] located at 1355-57 New York Avenue, N.E. . . . . I know the reputation and character of you and your vice-president, Mr. Samuel S. Howlette.  I know that you and your organization strive for excellence."  Id.

1977)).  Plaintiff cannot establish liability without a "strong showing of intent" to disrupt

ongoing business relationships; a general intent to interfere or knowledge that conduct will injure

the plaintiff's business dealings is insufficient to impose liability.  Genetic Systems Corp. v.

Abbott Labs., 691 F. Supp. at 423.  "A competitor's conduct must be more egregious, for

example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or

disparagement."  Id. (citing Business Equip. Ctr., Ltd. v. De Jur-Amsco Corp., 465 F. Supp. 775,

788 (D.D.C. 1978) and PPX Enters. v. Audio Fidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir.

1987)).

   Plaintiff has failed to establish intentional interference inducing or causing a

breach or termination of the expectancy.  The Court has already concluded that plaintiff's libel

claims lack merit, and plaintiff's accusations that defendants Ward Five and Carter

misrepresented themselves and committed fraud are vague and unsupported by the evidence and

are thus  insufficient to establish a claim.  Accordingly, plaintiff's claim of tortious interference

with a business relationship fails to raise a genuine issue of material fact sufficient to allow a

jury to find in plaintiff's favor, and defendants are entitled to summary judgment on this claim.[9]

*D.  Abuse of Process (Count VII)*

   Plaintiff finally claims that defendants committed abuse of process by seeking an

injunction in Superior Court and by appealing Bannum's zoning approval to the BZA in order to

---

   [9]  Plaintiff asserts that the James Letter (conveying ANC5B commissioner Regina James' support for another company's bid for the CCC contract) demonstrates James' intentional interference in plaintiff's relationship with the BOP.  See See Pls. Opp. at 10; James Letter.  In light of the fact that defendants' conduct in opposing zoning approval for the CCC did not constitute libel, fraud or misrepresentation, and that subsequent decisions of the BZA and the D.C. Office of Campaign Finance show defendants' actions to have had legal justification, this letter does not raise a triable issue of fact as to any ulterior motive.

"shut[] Bannum down and thwart[] the operation of the BOP CCC at the subject property," a

purpose for which these institutions were not designed.  Compl. ¶¶ 45-48.  Defendants argue that

plaintiff has failed to allege any perversion of the judicial process, and that in any event there

was no such perversion because defendants had meritorious claims and employed the courts and

the BZA for their intended purpose.  See Def. Mot. Dism. at 10-13.

   To prevail on a claim for abuse of process, a plaintiff must demonstrate that

"process has been used [by defendant] to accomplish some end which is without the regular

purview of the process, or which compels the party against whom it is used to do some collateral

thing which he could not legally and regularly be required to do."  Jacobson v. Thrifty Paper

Boxes, Inc., 230 A.2d 710, 711 (D.C. 1967).  "The mere issuance of the process is not

actionable, no matter what ulterior motive may have prompted it; the gist of the action lies in the

improper use after issuance."  Hall v. Hollywood Credit Clothing Co., 147 A.2d 866, 868 (D.C.

1959); see also Bown v. Hamilton, 601 A.2d 1074, 1079 (D.C. 1992); Harrison v. Howard Univ.,

846 F. Supp. 1, 3 (D.D.C. 1993) ("[O]ne who invokes the legal process to obtain such relief as it

offers commits no abuse of process.  If the relief is within the power of the court or agency to

grant, and is warranted by the merits, the process has been lawfully employed.").[10]

   Plaintiff's allegations of improper motive notwithstanding, its abuse of process

claim cannot survive in view of the undisputed fact that in availing themselves of the judicial

---

[10]  Although plaintiff urges the Court to adopt the expansive formulation of the abuse of process standard set forth in Neumann v. Vidal, 710 F.2d 856 (D.C. Cir. 1983), the D.C. Circuit has since embraced the more restrictive standard of Bown v. Hamilton, 601 A.2d at 1079-80, and Morowitz v. Marvel, 423 A.2d 196, 198-99 (D.C. 1980).  See Moore v. United States, 213 F.3d 705 (D.C. Cir. 2000); Scott v. District of Columbia, 101 F.3d 748 (D.C. Cir. 1996).  Underlying this standard is the purpose of allowing "unfettered access to the courts" and avoiding any "chilling and inhibitory effect on would-be litigants of justiciable issues"  See Bown v. Hamilton, 601 A.2d at 1080; Morowitz v. Marvel, 423 A.2d at 197-98.

process defendants sought only such relief as the system legitimately offered.  Defendants did

not attempt to compel plaintiff to do some "collateral thing which [it] could not legally and

regularly be compelled to do."   See Jacobson v. Thrifty Paper Boxes, Inc., 230 A.2d at 711.

Defendants sought in Superior Court to enjoin Bannum from operating the proposed CCC, and

appealed to the BZA to compel Bannum to obtain zoning approval through the correct

administrative channels – both ends within the "regular purview of the process."  See id.  Their

ultimate success in the BZA appeals process validates the proposition that defendants could

legally and regularly compel plaintiff to cease operation of the CCC in Ward 5.  Accordingly,

the Court grants defendants' motion for summary judgment on plaintiff's abuse of process claim

because plaintiff has failed to offer evidence sufficient to raise a genuine issue of material fact

with respect to this claim.

### E. Defendants' Counterclaim

Defendants' counterclaim for abuse of process rests on allegations that plaintiff

filed a frivolous action to harass, cause mental anguish, humiliate and retaliate against

defendants.  See Ans. and Counter Cl. at 5-6.  Plaintiff moves to dismiss the counterclaim on the

ground that defendants "have failed to allege one way that Plaintiff has perverted the judicial

process or has even used the judicial process to attempt to achieve something not contemplated

in the regular use of the judicial process."  Mot. Dism. Counter-Claim at 4.

Defendants' abuse of process claim also must fail because defendants do not

allege any misuse of the judicial process by their adversary.  Regardless of whether Bannum

sought to "harass and retaliate" against defendants by filing this lawsuit, there is neither

allegation nor evidence that it sought a "collateral thing which [defendants] could not legally and

regularly be compelled to do."  See Jacobson v. Thrifty Paper Boxes, Inc., 230 A.2d at 711.

Simply filing a lawsuit is not actionable, regardless of the ulterior motive that may have

prompted the lawsuit.  See Morowitz v. Marvel, 423 A.2d at 198-99.  Defendants argue that they

have suffered significant inconvenience and loss of resources as a result of this case, but such

results are the unhappy incident of almost any litigation and are an insufficient basis for an abuse

of process claim.  Defendants' counterclaim for abuse of process must be dismissed for failure to

state a claim.

### F.  Other Claims

The Court finds that Counts I and II are moot.  Count I of plaintiffs' complaint

requests a declaration from the Court that the DCRA properly granted zoning approval to the

Bannum.  See Compl. at 13.  In September 2003, the BZA granted ANC5B's appeal and

determined that the DCRA had improperly granted Bannum zoning approval.  See BZA

Decision at 16.  Thus, intervening events have rendered the plaintiff's request for declaratory

relief moot.  In Count II, plaintiff requests that the Court enjoin defendants from further abuse of

process, defamation or interference with contract and business relationship. See Compl. ¶¶ 14-

15.  Because the Court grants judgment for defendants on plaintiff's underlying claims,

plaintiff's request for relief in Counts I and II is moot.

III.  CONCLUSION

For the reasons stated, the Court granted summary judgment for defendants on Counts III, IV, V, VI and VII of plaintiff's complaint, and dismissed Counts I and II as moot. The Court furthermore granted plaintiff's motion to dismiss defendants' counterclaim for abuse of process.

An Order and Judgment consistent with this Opinion was issued on March 31, 2005.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   August 10, 2005